THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN MacNAB, Defendant-Appellant.

First District (5th Division)   No. 86—0026

Opinion filed October 30, 1987.

Kenneth L. Cunniff, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Terry Takash, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant Kevin MacNab was convicted of attempted murder and possession of explosives and was sentenced to a six-year prison term plus three years' mandatory supervised release. On appeal defendant contends that the trial court erred in failing to suppress certain statements allegedly made by defendant.

We reverse and remand for a new trial.

Prior to trial defendant filed three motions to suppress his statements. The following pertinent evidence was adduced at those hearings.

Elk Grove police investigators Michael Severns and William Zimmerman testified that on December 2, 1983, they were investigating the placing of a pipe bomb the day before in Daniel Terket's truck. Terket suspected defendant because of some antagonism between defendant and defendant's former girlfriend, who was the sister of Terket's girlfriend. In June of 1983 Investigator Severns had investigated complaints of threatening telephone calls allegedly made by defendant to these two women. Based on this information, the investigators considered defendant a suspect and were seeking to question him. The investigators went to the vicinity of the Des Plaines courthouse, where defendant's parents had told them the defendant had a court date.

At about 11 a.m., another investigator, Mr. Mersel, saw defendant walking near the courthouse and began talking to him. Mersel summoned Severns, Zimmerman, and another investigator to that loca-

tion. They all arrived in separate unmarked police cars. Severns, who knew defendant from the telephone-threat investigation, asked if defendant would come to the police station to discuss the bomb incident. Defendant agreed, got into the front seat of Severns' car, and was driven to the Elk Grove police station. At the station, he agreed to submit to a polygraph examination. He was then driven to the offices of John Reid and Associates, where a polygraph examiner, Louis Senese, administered a polygraph examination. At about 4:30 p.m. Senese told the investigators defendant was attempting to "disrupt the machine" and wanted to talk to them. Defendant told the investigators that he had given approval for someone else to place the bomb, but only in an attempt to scare Terket, not to hurt anybody. Defendant was then arrested and informed of his *Miranda* rights. He told the investigator he did not want to say anything, and was not questioned further at that time.

The investigators denied coercing defendant or physically or mentally abusing him in any manner during these events. He was not handcuffed until he was arrested at John Reid and Associates. Louis Senese testified that, when defendant came to his office, the investigators left defendant sitting alone in the lobby, without handcuffs, while they discussed the case with him. During the examination he concluded that defendant was distorting the results by controlling his breathing and manipulating the electrodes on his fingertips.

Defendant was transported back to the Elk Grove police station where, at about 9:30 p.m., Assistant State's Attorney Casimir Bartnik spoke to him in the presence of Investigators Zimmerman and Severns. Bartnik testified that he advised defendant of his *Miranda* rights and defendant read and signed a printed list of those rights, indicating that he understood them. Defendant then either asked, "When can I speak to a lawyer?" or "Can I speak to a lawyer?" Bartnik told him he could any time. Bartnik recalled that defendant also either asked if he could speak to a public defender or when he could speak to a public defender, mentioning that Assistant Public Defender Mary Danahy had represented him on some case. Bartnik told him no public defender was available in the police station and if he wanted to "keep his mouth shut" he could talk to a public defender when he came to court. According to Bartnik, defendant then said that he could speak for himself and wanted to tell his own side of the story. After over two hours of questioning, defendant gave an incriminating statement. Bartnik then asked him if he would sign a written version of the statement. Defendant asked to speak to an attorney, and after a telephone conference, declined to give a written state-

ment, stating he was acting on the advice of the attorney. This occurred at about 12:30 a.m.

Investigator Severns testified that at about 2 a.m. he and other officers executed a search of defendant's mother's house, pursuant to her signed waiver. They brought along the defendant, who, in response to their questions, gave several additional incriminating statements.

Testifying for defendant, Assistant Public Defender Mary Danahy stated that on the morning of December 2, 1983, she was representing the defendant on a misdemeanor charge at the Des Plaines courthouse. Defendant told her that he recognized an Elk Grove police officer who kept coming into the courtroom. He believed the police intended to arrest him, as he had heard that they had been looking for him at his parents' home in connection with a car bombing. Danahy advised him that if arrested he should tell the police nothing except that he wanted her present before questioning. She also told him she would be in the courtroom or upstairs in her office.

Defendant's account of these events varied widely from that of the State's witnesses. He testified that after he left the courthouse and was walking on the street, the police blocked his path with two unmarked cars, grabbed him, threw him against a car, and frisked him. He was then held at gunpoint, with four police officers and four police cars surrounding him. Defendant immediately requested that Danahy be sought, but the police refused. He was pushed into the back of a squad car and driven to the police station. There his repeated requests for an attorney were refused. He refused to take a polygraph examination but was taken to John Reid and Associates anyway. He would not cooperate in that examination. Despite questioning and threats by Investigators Zimmerman and Severns at that location, he never gave a statement. He was then informed that he was under arrest and taken back to the station. There he was allowed to call his mother, whom he told to call a relative, Dan Doud, who was an attorney. The police later told him his mother could not reach that attorney. Subsequently, his mother visited him and told him she would tell the police he wanted an attorney.

According to defendant, when Assistant State's Attorney Bartnik arrived, Bartnik advised him of his rights and he asked Bartnik when he could talk to a lawyer, telling Bartnik about Danahy. Bartnik told him he had discussed the case with Danahy, whom he knew, and she would not deal with a "scumbag" like him. Defendant asked for a public defender in the building and was told none was available. He repeatedly asked for and was refused an attorney. At midnight he was

allowed to call his cousin, who was an attorney. Bartnik then left, saying that once defendant's lawyer had invoked defendant's right to silence he could no longer be questioned. However, Investigators Severns and Zimmerman continued to question him. Defendant denied ever making any incriminating statements. He testified that at the subsequent search of his parents' home he was questioned but invoked his right to an attorney and refused to talk. The defendant's mother also apparently testified at these hearings, but her testimony has not been included in the record on appeal.

The court denied the motions to suppress, finding that defendant had voluntarily consented to accompany the police to the station after he left the courthouse, had voluntarily consented to the polygraph examination, and had volunteered the incriminating statement which led to his arrest at John Reid and Associates. The court also found that defendant had then knowingly waived his right to remain silent and his right to counsel and had freely and voluntarily made subsequent statements to the police and the assistant State's Attorney.

At trial the State presented evidence that a pipe bomb had been placed in a truck belonging to Daniel Terket. The State also introduced defendant's statements to Assistant State's Attorney Bartnik and his subsequent statements to the police during the search of his parents' home, in which he admitted constructing this bomb and placing it in Terket's truck. The State did not introduce the statement allegedly made to the police by defendant following the polygraph examination.

Opinion

■■ We find no merit to defendant's contention that the court erred in failing to find that he was arrested and subject to custodial interrogation prior to the time he allegedly made the first incriminating statement following the polygraph examination. Clearly, the trial court believed the State's witnesses, who testified that defendant freely and voluntarily agreed to accompany the police to the police station and also voluntarily agreed to take the polygraph examination. The polygraph examiner corroborated the police testimony on this issue when he testified that during the examiner's conference with the police they left the defendant, unattended and not handcuffed, in the lobby. The court specifically found that there was no physical or mental coercion of the defendant by the police. Without any specific citation to the record, defendant contends that the court did not consider whether under the circumstances presented a reasonable, innocent person would have believed he was free to leave. (*People v. Savory*

(1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226.) The evidence we have cited, along with the stated findings of the court, amply supports such a finding and, accordingly, we will not disturb the court's determination.

■ Defendant also contends that the court should have granted his third motion to suppress, which was based on the contention that he was arrested without probable cause when the police first encountered him outside the Des Plaines courthouse. At the separate hearing on this motion only the defendant testified, substantially repeating his earlier testimony concerning those events. The trial court, relying on the State's testimony from the earlier hearings, denied this motion. Defendant contends that the court erred in relying on testimony from previous hearings. He also contends that the court was required to believe his testimony because it was uncontradicted in that hearing. We do not reach this issue because we find that at trial the State again presented ample evidence to support the conclusion that defendant was not arrested near the courthouse, but instead voluntarily accompanied the police to the police station. Defendant does not dispute that such trial testimony may properly be considered in evaluating the propriety of a prior ruling on a motion to suppress. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.) Accordingly, we find no error in the court's refusal to quash the arrest and suppress defendant's statements based upon that arrest.

■ In denying defendant's suppression motions, however, the trial court also found that defendant had waived his right to counsel when he gave the incriminating statements to Assistant State's Attorney Bartnik. Based on our review of the State's evidence concerning this questioning, we agree with defendant's contention that the trial court erred. In this regard we find this case to be controlled by the recent United States Supreme Court case of *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490. In *Smith* the defendant was properly arrested and then interrogated. The police began to advise him of his *Miranda* rights, and immediately after being advised of his right to have a lawyer present during questioning, defendant stated: "Uh, yeah. I'd like to do that." The police did not stop questioning the defendant; they continued to advise him of his *Miranda* rights, including his right to have an appointed lawyer if he could not pay for one. The following then ensued:

"Q. Do you wish to talk to me at this time without a lawyer being present?

A. Yeah and no, uh, I don't know what's what, really.

Q. Well. You either have to talk to me this time without a

lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to.

A. All right. I'll talk to you then."

Defendant then gave a number of statements, including a confession, before ultimately again requesting a lawyer, a request which was honored by the termination of the questioning.

The Illinois Supreme Court found that defendant's statements, considered in total, were ambiguous, and did not effectively invoke his right to counsel. The United States Supreme Court reversed this determination. The court noted that in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, it had intended to establish a clear requirement that all questioning should cease once a defendant had requested counsel. Thus the court found that the Illinois Supreme Court should not have looked beyond defendant's initial statement indicating a desire for a lawyer in evaluating whether he did in fact wish one. The court also characterized the subsequent statements of rights made by the police as "further interrogation" and noted that defendant was incorrectly advised of his rights in these subsequent statements. The court found this subsequent conduct by the police to be the sort of "badgering" that *Edwards* was designed to prevent.

In this cause the defendant was arrested after making statements which the trial court found to be voluntary. That determination was based on the court's belief in the police version concerning defendant's willingness to voluntarily answer their questions and undertake a polygraph examination. We have determined not to disturb that credibility determination. But it is the State's evidence of what then occurred that should have prompted the trial court to suppress defendant's subsequent statements.

Defendant was arrested based on his statement that he had utilized someone else to plant the bomb. He was immediately advised of his *Miranda* rights and he invoked those rights, refusing to talk to the police. Several hours later Assistant State's Attorney Casimir Bartnik was called in to question him. Bartnik advised him of his rights, including his right to appointed counsel if indigent. According to Bartnik, defendant then said either, "When can I speak to a lawyer?" or "Can I speak to a lawyer?" Defendant also asked when he could talk to a public defender, and mentioned the name of a public defender, Mary Danahy, who had been representing him on another matter. Clearly, this was a request for counsel. But, instead of ceasing the interrogation, Bartnik told the defendant that no public defender

was available in the police station and that if he wanted to keep his mouth shut he could talk to one when he came to court. This statement gave the erroneous impression that defendant would be unable to contact an attorney prior to his court date. Under the holding of *Smith*, Bartnik's statements to defendant constituted improper questioning after he had already requested counsel. Therefore the State cannot rely on defendant's alleged subsequent agreement to waive his right to counsel. The trial court should have suppressed the ensuing inculpatory statements made by defendant, including the statements made during the subsequent search. Because those statements were relied on extensively at trial, defendant's convictions must be reversed and the cause remanded for a new trial.

For these reasons, we reverse the judgment of the circuit court and remand this cause for a new trial.

Reversed and remanded for further proceedings.

SULLIVAN, P.J., and MURRAY, J., concur.