24 A.3d 96

**Warren Lee BALLARD**

v.

**STATE of Maryland.**

**No. 73, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 12, 2011.

5.

Peter F. Rose, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, J.

The present case calls upon us to explore the contours of the right to counsel during custodial interrogation, which the Supreme Court recognized in *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is undisputed that Petitioner Warren Lee Ballard received proper *Miranda* warnings and validly waived his *Miranda* rights before interrogation began. The question we must answer is whether, mid-way through the interrogation, Petitioner unequivocally invoked his right to counsel when he uttered the words, "You mind if I not say no more and just talk to an attorney about this." For the reasons that follow, we hold that those words constituted an unequivocal invocation of the right to counsel. Therefore, pursuant to *Miranda* and its progeny, the interrogating detective was required at that moment to cease all questioning. Rather than do so, the detective continued the interrogation and elicited statements from Petitioner that he was entitled to have suppressed as the product of the *Miranda*-violative interrogation.

I.

Petitioner was tried on an agreed statement of facts.[1] The agreed-upon facts disclose that, on December 13, 2007, at

---

1. Prior to trial, the parties entered into a "Disposition Agreement" stating that Petitioner would waive his right to a jury trial and be tried

approximately 10:30 p.m., in Salisbury, Maryland, James Miller contacted authorities upon finding the body of his sister, Shirley Smith, in the apartment they shared. Dr. Pamela Southall, Assistant Medical Examiner, performed an autopsy on December 14, 2007, and discovered Ms. Smith had a broken hyoid bone in her neck. Based on that finding, Dr. Southall determined that the manner of death was homicide by asphyxia, the signs of which were consistent with strangulation. After learning of Dr. Southall's findings, police began a criminal investigation into Ms. Smith's death.

On December 27, 2007, the police found Petitioner in possession of the SIM card[2] associated with Ms. Smith's cellular phone account, and took him into custody. Four days later, Detective Kaiser conducted a videotaped interrogation of Petitioner, during which he made several incriminating statements.

Petitioner was indicted on charges of first degree murder and related offenses. He filed a motion to suppress a portion of what he disclosed during that interrogation. Petitioner, through counsel, acknowledged at the outset of the hearing on the motion that he was "Mirandized" and waived the *Miranda* rights. The interrogating officer, Detective Kaiser, did not testify but an excerpt of the videotaped confession was played for the court and a transcript of the excerpt portion was entered into evidence. The parties agreed that the tran-

---

by the court on an agreed statement of facts. The Agreement also specified that Detective Kaiser's interrogation of Petitioner would be admitted as an exhibit, but that Petitioner reserved his continuing objection based on his previous motion to suppress statements he made during the interrogation. The Agreement was entered into evidence at trial.

**2.** A SIM (Subscriber Identity Module) card is a specially programmed microchip that inserts into a compatible Global System for Mobile Communications (GSM) mobile device. The SIM card encrypts transmissions and identifies the user to the mobile network. Without a SIM card inserted into the mobile equipment, only emergency calls to 911 can be made. "What is a SIM card?" http://www.att.com/esupport/article.jsp?sid=53580&cv=820#fbid=1RzIn98Oqs7; *see also In re Synchronoss Secs. Litig.*, 705 F.Supp.2d 367, 375 (D.N.J.2010).

scribed excerpt, with some handwritten corrections on it, accurately reflected the content of the portion of the interrogation played for the court.[3]

The first page of the transcript excerpt, which is numbered page 27, begins with the following:

[Petitioner]: I wasn't upset, she wasn't upset, nobody was upset.

Det. Kaiser: So what, so then you're telling me that it was a mistake of what happened.

[Petitioner]: I'm saying when I left . . .

Det. Kaiser: Let's back up, OK?

[Petitioner]: No one was hurt, no one was injured when I left.

Det. Kaiser: Let's go back up. Explain to me why this happened. Because I need an explanation from you. I know what the evidence is telling me. I already know that. DNA collected from various parts of her body matches DNA from your body. OK? Matching up somewhat of what we just talked about, but there's still a missing point here. And a missing factor in this whole thing right now. OK? And we need to sit here and work this out because what I don't want to happen is, you know, let's not read the evidence. I think there's a really important explanation as to why this occurred. We know what happened, we need to know why. Was it rough sex? That got out of hand? She have a weapon? Did she come at you with a weapon? Those are key factors to this Warren. You need to understand that.

---

**3.** A transcript of the entire videotaped confession and a DVD recording were entered into evidence at trial. The parties in their briefs refer to the version of the transcript introduced at that proceeding. That transcript, however, differs from the excerpted transcript the parties presented to the suppression court, albeit not in material respect. When reviewing a court's ruling on a suppression motion, we are constrained to rely solely on what was before the suppression court. *Lee v. State*, 418 Md. 136, 148, 12 A.3d 1238, 1245 (2011). Therefore, we shall quote from and rely on the version of the transcript excerpt that came into evidence at that hearing.

[Petitioner]: I know.

Det. Kaiser: Very very important key factors.

[Petitioner]: Oh man.

Det. Kaiser: The only way for [you,] Warren to deal with this is to let it out, explain your side of the story so that you can sleep at night. And you can have a clear head, that's it. Tell me what happened.

**[Petitioner]: You mind if I not say no more and just talk to an attorney about this.**

**Det. Kaiser: What benefit is that going to have?**

**[Petitioner]: I'd feel more comfortable with one.**

Det. Kaiser: Well, you understand that by doing that, OK, it kind of cuts our ties off somewhat, OK, and um you don't have to say a word. I'm going to explain something to you here. You know, your opportunity to explain why this happened is going to be out the door. OK? And I think that, and I'm telling you right now, OK and it came out of my mouth, that the explanation of why this happened is a very very important aspect of this investigation. OK? But in order for us to talk and you to tell me that, OK, now that you just said what you just said, is going to throw it all away. I want you to keep that in mind. This is your opportunity. There's not going to be another opportunity. I'm willing to work with you here. All right? So, before we go any further, you had just made mention a couple of minutes ago that you wanted an attorney, that's what you told me, OK, so that stops me. OK. And if you feel like you want to say any more, which I think it's probably in your best interest to, OK, we're going to go back over some of your rights, OK, that you have. But that's your option. Now, what I want to know is, do you want to explain to me and give me an explanation as to what happened that night?

[Petitioner]: Let me use the bathroom and I'll tell you.

Det. Kaiser: Huh? Hold on, hold on, don't say a word. What do you want to do? Do you want an attorney present with you right now?

[Petitioner]: I'll talk to you when I use the bathroom, alright. I don't need no attorney.

Det. Kaiser: You don't want an attorney?

[Petitioner]: Mm mm.

Det. Kaiser: Do you understand and know what you're doing right now?

[Petitioner]: Hanging myself.

Det. Kaiser: No no no no, do you understand and know what you're doing at this point in time?

[Petitioner]: I guess, I don't know.

Det. Kaiser: Well it's yes or no. Do you understand and know what you're doing? Let me just reiterate this form to you. OK?

(Emphasis added.)

At that point, Detective Kaiser reissued the *Miranda* warnings and Petitioner indicated that he understood his rights. He was then permitted to use the restroom. When Petitioner returned, Detective Kaiser reconfirmed that Petitioner understood the rights explained to him and "wanted to get this off [his] chest."

The transcribed excerpt of the interrogation that was admitted at the suppression hearing does not disclose much of what Petitioner said during the remainder of the interrogation. The complete transcript of the interrogation admitted at trial discloses that Petitioner made a series of statements to Detective Kaiser admitting that he and Ms. Smith had an altercation, he "did a choke hold on her," he "may have hit her in the mouth," and she ended up "laying on the bed" but was still breathing when he ran out of the apartment. At Detective Kaiser's suggestion, Petitioner wrote a letter of apology stating that he was "sorry that this could have happened," it was "an accident on [his] behalf," he "never knew that this was so serious," and he "still can't believe that it happened."

Petitioner argued at the suppression hearing that, by uttering the words, "You mind if I not say no more and just talk to an attorney about this," he unequivocally and unambiguously

invoked his rights to counsel and to silence. He focused his argument, though, on the invocation of the right to counsel and argued that, under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Detective Kaiser was required to cease all questioning as soon as Petitioner uttered those words.

The court denied the motion. The court agreed with the State that Petitioner's statement was an ambiguous and equivocal statement that did not sufficiently invoke Petitioner's right to counsel and, consequently, his subsequent statements to Detective Kaiser were not the product of an *Edwards* violation.

Petitioner filed a motion to reconsider the suppression ruling. The court heard argument on the motion and again denied the motion to suppress, explaining in detail its reasons for that ruling. Among other things, the court said:

> Now, I had previously concluded that it was not clear and unambiguous, that it was, rather, equivocal and ambiguous, and I think in this regard also, I should make clear it's not the words alone but rather the context of the words and in this particular case, it's not only the typed word on a piece of paper, but I also heard [Petitioner]'s interview with Detective Kaiser, so I also have the opportunity to consider his inflection, of the tone and things of that sort, and I concluded at the earlier hearing that it was an ambiguous assertion of right to counsel, and I believe I still feel that way.

At the subsequent trial on an agreed statement of facts, the court found Petitioner guilty of second degree murder and lesser charges.[4]

On appeal to the Court of Special Appeals, Petitioner challenged the denial of the motion to suppress. The Court of Special Appeals, in an unreported opinion, affirmed the judg-

---

4. The State entered a nolle prosequi to the charge of first degree murder, pursuant to the parties' agreement to have the trial proceed by way of the agreed upon statement of facts.

ments of conviction, agreeing with the trial court that Petitioner's statement, "You mind if I not say no more and just talk to an attorney about this," was an ambiguous invocation of both the right to counsel and the right to silence. The intermediate appellate court therefore held that Detective Kaiser's conduct during the remainder of the interrogation did not violate *Edwards* and, as a consequence, the trial court properly denied the suppression motion.

Petitioner filed a petition for writ of certiorari, which we granted to answer the following question: "Whether Petitioner's statements made during his custodial interrogation after he invoked his right to counsel and right to remain silent should have been suppressed." Notwithstanding his phrasing of the question presented, Petitioner in his brief and at oral argument concentrated on whether he was deprived of the right to counsel, under *Edwards.* Because we resolve the appeal on the ground that the police committed an *Edwards* violation, there is no need to address Petitioner's less strenuously argued right to silence claim.

## II.

The Supreme Court's decisions in *Miranda* and its progeny are grounded in that portion of the Fifth Amendment to the United States Constitution that reads: "No person ... shall be compelled in any criminal case to be a witness against himself...." The *Miranda* Court, recognizing the coercion inherent in custodial interrogation, 384 U.S. at 445–48, 86 S.Ct. 1602, held that an individual taken into custody,

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

*Id.* at 479, 86 S.Ct. 1602.

"The rights expressed in the *Miranda* warning pertain throughout the interrogation." *Lee v. State,* 418 Md. 136,

150, 12 A.3d 1238, 1246 (2011) (citing *Berghuis v. Thompkins,*
560 U.S. ——, 130 S.Ct. 2250, 2263–64, 176 L.Ed.2d 1098
(2010) ("If the right to counsel or the right to remain silent is
invoked at any point during questioning, further interrogation
must cease."); *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602 ("If
the individual indicates in any manner at any time prior to or
during questioning, that he wishes to remain silent, the inter-
rogation must cease. . . . If the individual states that he wants
an attorney, the interrogation must cease until an attorney is
present.")). Therefore,

> when an accused has invoked his right to have counsel
> present during custodial interrogation, a valid waiver of that
> right cannot be established by showing only that he re-
> sponded to further police-initiated custodial interrogation
> even if he has been advised of his rights . . . [He] is not
> subject to further interrogation by the authorities until
> counsel has been made available to him, unless the accused
> himself initiates further communication, exchanges, or con-
> versations with the police.

*Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880. The protection
afforded under *Edwards* provides a "second layer of prophy-
laxis for the *Miranda* right to counsel. . . ." *McNeil v. Wis-
consin,* 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158
(1991). The *Edwards* rule establishes a "bright-line" prohibi-
tion against all subsequent questioning because, in the absence
of such a prohibition, "the authorities through 'badgering' or
'overreaching'—explicit or subtle, deliberate or unintention-
al—might otherwise wear down the accused and persuade him
to incriminate himself notwithstanding his earlier request for
counsel's assistance." *Smith v. Illinois,* 469 U.S. 91, 98, 105
S.Ct. 490, 83 L.Ed.2d 488 (1984) (per curiam) (citations and
brackets omitted). Accordingly, the Court has "emphasized
that a valid waiver 'cannot be established by showing only that
[the accused] responded to further police-initiated custodial
interrogation.' Using an accused's subsequent responses to
cast doubt on the adequacy of the initial request *itself* is even
more intolerable." *Id.* at 98–99, 105 S.Ct. 490 (citation omit-
ted).

The accused's invocation of the right to counsel, though, cannot be equivocal or ambiguous. The Supreme Court made clear in *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), that applicability of the *Edwards* rule "requires courts to determine whether the accused *actually invoked* his right to counsel." (Internal quotation marks and citation omitted.) That inquiry, moreover, is "objective." *Id.* at 458–59, 114 S.Ct. 2350 ("To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry."). Consequently,

> [i]nvocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.* at 459, 114 S.Ct. 2350 (citations omitted).

The *Davis* Court allowed that, if a suspect makes an ambiguous reference to an attorney, it would be "good police practice" to ask clarifying questions to determine the suspect's desire in that regard, but police are not required to do so. *Id.* at 461, 114 S.Ct. 2350. The *Davis* Court's holding is expressed as follows: "We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect

clearly requests an attorney." *Id.* at 461, 114 S.Ct. 2350. In short, if, from the perspective of a reasonable officer, the suspect's statement is not an unambiguous or unequivocal request for counsel, then the officers have no obligation to stop questioning him.

## III.

■ The question boils down to whether Petitioner's statement, "You mind if I not say no more and just talk to an attorney about this," was a sufficiently clear articulation of his desire to have counsel present during the remainder of the interrogation, such that a reasonable police officer in the circumstances of Detective Kaiser "would understand the statement to be a request for an attorney." *Id.* at 459, 114 S.Ct. 2350. We conclude that the answer to that question is "yes"; Petitioner's words were an unambiguous and unequivocal assertion of the right to counsel.[5]

We disagree with the State's suggestion that Petitioner's statement, assessed either alone or in context, was both equivocal and ambiguous, thereby permitting Detective Kaiser to continue the interrogation. The State urges a comparison between Petitioner's statement and the statement, "Maybe I should talk with a lawyer," which the Supreme Court held in *Davis* was an ambiguous invocation of the right to counsel. *Id.* at 462, 114 S.Ct. 2350. And the State seems to agree with the suppression court that Petitioner's statement is akin to the statement at issue in *Matthews v. State,* 106 Md.App. 725, 737–38, 666 A.2d 912, 917 (1995). In that case, the Court of Special Appeals held that the defendant's statement, "Where's

---

**5.** In coming to that conclusion, we have borne in mind our responsibility to "view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion" and to "defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *Lee,* 418 Md. at 148, 12 A.3d at 1245–46 (internal quotation marks and citations omitted). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Id.* at 148–49, 12 A.3d at 1246.

my lawyer?" was an ambiguous assertion of the right to counsel. The State also relies on *Minehan v. State,* 147 Md.App. 432, 443–44, 809 A.2d 66, 72 (2002). In *Minehan,* the Court of Special Appeals commented in dicta that the statement, "Should I get a lawyer," was no more effective as an assertion of the right to counsel than "Maybe I should talk to a lawyer," deemed ambiguous in *Davis.*

Petitioner's statement is distinguishable from the statements considered in *Davis, Matthews* and *Minehan.* None of the statements under consideration in those cases—"Where's my lawyer," "Maybe I should talk to a lawyer," or "Should I get a lawyer"—provides any indication that the suspect, at the time the statement was uttered, actually desired to have a lawyer present for the remainder of the interrogation. When Matthews asked "Where's my lawyer?" a reasonable officer could and likely would infer either that Matthews was wondering about his lawyer's whereabouts or, perhaps, whether a lawyer had been provided for him. The questions "Maybe I should talk to a lawyer," and "Should I get a lawyer" suggest that the suspect *might* want a lawyer, which, under *Davis,* is insufficient to require the officer to cease questioning. 512 U.S. at 461, 114 S.Ct. 2350.

Petitioner's words, by contrast, even if understood to be phrased as a question, as the suppression court evidently found them to be,[6] transmit the unambiguous and unequivocal message that he wanted an attorney. A speaker who begins a statement with the phrase, "you mind if . . ." suggests to his or her audience that the speaker is about to express a desire, whether to do something or have something occur. The

---

6. We have mentioned that the suppression court found relevant not only what Petitioner said but how he said it. The court stated:

I should make clear it's not the words alone but rather the context of the words and in this particular case, it's not only the typed word on a piece of paper, but I also heard [Petitioner]'s interview with Detective Kaiser, so I also have the opportunity to consider his inflection, of the tone and things of that sort, and I concluded at the earlier hearing that it was an ambiguous assertion of right to counsel, and I believe I still feel that way.

phrase "you mind if . . ." in this context is a colloquialism; it is reasonably assumed that the speaker is not actually seeking permission to do the thing desired or to have the desired thing occur. *Cf. Prioleau v. State*, 411 Md. 629, 645, 984 A.2d 851, 861 (2009) (agreeing with the analysis that the phrase "what's up," is "a general term of salutation" that could not reasonably be viewed as designed to elicit an incriminating response from the suspect (citation omitted)).

But even if viewed not as a colloquialism but rather as having literal meaning, the import of the words is no different. Viewed from the perspective of a reasonable police officer in the position of Detective Kaiser, the most that could be said about Petitioner's words, "You mind if I not say no more and just talk to an attorney about this," is that Petitioner, though undoubtedly asking for an attorney, sought to couch the request in polite or (more likely, given the context) deferential terms.[7] In other words, to the extent that the phrase "you mind if . . ." is understood as Petitioner genuinely posing a question, the only question he reasonably posed was whether Detective Kaiser "mind[ed]" if Petitioner stopped talking and got an attorney.

Petitioner's statement is no less unambiguous than statements by a suspect that he or she would "rather" have an attorney, which courts have treated as unambiguous assertions of the right to counsel. *See, e.g., State v. Harris*, 305 S.W.3d 482 (Mo.Ct.App.2010) (holding suspect invoked right to counsel by stating "I'd rather appoint a lawyer"); *McDaniel v.*

---

7. Justice Souter, who wrote separately in *Davis*, made the following observations about suspects in the position of Petitioner:

   A substantial percentage of [suspects] lack anything like a confident command of the English language; many are "woefully ignorant," and many more will be sufficiently intimidated by the interrogation process or overwhelmed by the uncertainty of their predicament that their ability to speak assertively will abandon them.[FN]

   > [FN] Social science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant. See W. O'Barr, Linguistic Evidence: Language, Power, and Strategy in the Courtroom 61–71 (1982).

   512 U.S. at 469–70 (Souter, J., concurring) (some citations omitted).

*Commonwealth,* 28 Va.App. 432, 506 S.E.2d 21 (1998) (holding suspect invoked right to counsel by stating "I think I would rather have an attorney here to speak for me"). Although not a direct demand for counsel, a suspect stating he would rather have counsel unambiguously indicates his desire to have counsel present. The only question that remains is whether he will be permitted to have counsel present.

In short, we are persuaded by our independent view of the record that Petitioner, by uttering the words, "You mind if I not say no more and just talk to an attorney about this" made an unambiguous invocation of his right to counsel. At that time, Detective Kaiser was required to cease all further questioning. *Davis,* 512 U.S. at 458, 114 S.Ct. 2350 (citing *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880).

But even were we to assume for the sake of discussion that a reasonable officer in light of the circumstances would have understood only that Petitioner *might* have been invoking the right to counsel when he said "You mind if I not say no more and just talk to an attorney about this," then what occurred immediately thereafter resolved all doubt. The transcript reveals what happened:

[Petitioner]: You mind if I not say no more and just talk to an attorney about this.

Det. Kaiser: What benefit is that going to have?

[Petitioner]: I'd feel more comfortable with one.

Even if a reasonable officer would not have understood Petitioner's first, "you mind if . . ." statement to be a clear invocation of his right to counsel, his second statement, "I'd feel more comfortable with one," made in response to Detective Kaiser's inquiry, clarified Petitioner's desire for an attorney. Therefore, had we concluded that the prior assertion was ambiguous (we did not), the ambiguity was resolved when Petitioner explained precisely why he wanted counsel. At that point, even if not before, all questioning should have ceased. Detective Kaiser, though, did not cease the interrogation, and during the ensuing interrogation Petitioner made statements that the court should have suppressed. Because the State

made substantive use of those statements at Petitioner's trial on an agreed statement of facts, we shall order the judgments of conviction reversed, with a remand for a new trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AND REMAND FOR A NEW TRIAL; COSTS TO BE PAID BY WICOMICO COUNTY.